CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 21 2013

JULIA C. DUDLEY, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| JACQUELINE M. WHALEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12CV00032 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JAMES LARRY RUTHERFORD, | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

This diversity action is presently before the court on motions for summary judgment filed by defendants James Larry Rutherford ("Rutherford") and Shelley Daniel Rutherford ("Daniel"). For the reasons set forth below, Rutherford's motion will be granted in part and denied in part, and Daniel's motion will be granted.

## Summary of the Facts

The following facts are presented in the light most favorable to the plaintiff, Jacqueline M. Whalen. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Whalen resides on a farm in Nelson County, Virginia (the "Property"). She met Rutherford, a Florida resident, in 1977, and they became romantically involved in 1983. Although Rutherford proposed marriage to Whalen in 1986 and Whalen accepted his proposal, the couple never married. However, they maintained an intimate relationship for over twenty years.

In 1985, Whalen and Rutherford entered into a business relationship that they called W&R Partnership (the "Partnership"). The purpose of the Partnership was to "conduct the business of managing a horse farm and horse breeding operation" on the Property. (Partnership Agreement at 1.) The Partnership Agreement provided that Whalen would be the "managing partner," and that

she would "receive from the partnership a salary commensurate with her time, effort and expertise contributed to the business." (Id. at 2.) The Partnership Agreement further provided that the salary would be "determined from time to time by Whalen and Rutherford." (Id.)

In the 1990s, Whalen and Rutherford began discussing the possibility that Rutherford would move to Virginia and live with Whalen. They also discussed building a larger home on the Property. Rutherford was of the opinion that the existing house was too small, and he did not want to "be there unless it was bigger." (Rutherford Dep. at 58.) Since Rutherford was going to finance the construction of the new house, Whalen granted him a joint tenancy interest in the Property. The deed of gift was signed by Whalen on August 12, 2003.

The construction of the new house was financed by a mortgage loan in the amount of $1,470,000.00. The loan was secured by a deed of trust on the Property, which was signed by Rutherford on November 19, 2007, and by Whalen on November 24, 2007. By signing the deed of trust, Rutherford represented that he would occupy and use the Property as his principal residence for at least a year. (Deed of Trust at ¶ 6.) Rutherford also represented on a notarized borrower certification that he "intended to occupy said property as [his] primary residence within 60 days of loan closing or completion of a construction permanent loan." (Am. Compl. Ex. F.)

Prior to executing the deed of trust, Rutherford decided that it was necessary to draft an agreement "govern[ing] the use of the Property." (Rutherford Dep. at 68.) Rutherford directed his employee, Jody Bakes,[1] to handle this matter for him.

On November 20, 2007, Rutherford signed an agreement regarding the Property (the "First Agreement"), which was drafted by an attorney in Florida. The First Agreement provided, among other things, that Rutherford would "be responsible for (i) the payments due on the

---

[1] During his deposition, Rutherford identified Bakes as his "CFO." (Rutherford Dep. at 68.)

2

Mortgage; (ii) insurance on the Property; [and] (iii) taxes due on the Property." (First Agreement at 2.) The First Agreement was presented to Whalen in Virginia on November 27, 2007, and she signed it subject to the deletion of the eighth paragraph, which required her to "maintain property and casualty insurance on the Property for its full replacement cost." (Id.)

On November 30, 2007, Rutherford executed a second agreement regarding the Property (the "Second Agreement"). Unlike the First Agreement, the Second Agreement did not require Rutherford to make the payments due on the mortgage or the property tax payments. Instead it provided that Whalen would make the mortgage, insurance, and tax payments, and that Rutherford would be responsible for reimbursing her.

Whalen signed the last page of the Second Agreement on December 3, 2007. According to Whalen, Jody Bakes called her at 4:15 in the afternoon and advised her that "the changes" had been made to the agreement. (Whalen Dep. at 67). Bakes emphasized that Whalen needed to sign "the last page" before the local attorney's office closed, and that if Whalen "didn't do it, the note was going to expire and they would have to start over again." (Id.) Whalen arrived at the attorney's office five minutes before the office closed. She signed the last page of the Second Agreement, which was the only page that she was shown. Based on Bakes' representation, Whalen assumed that the only change was the deletion of the paragraph that she had marked out in the First Agreement. The actual changes to the Second Agreement, which required her to make the mortgage, insurance, and tax payments, were not disclosed to her.

Unbeknownst to Whalen at the time the time she signed the deed of trust, other loan documents, and the Second Agreement, Rutherford had been married to another woman for nearly eight months. Rutherford married Daniel on March 31, 2007. Whalen did not learn about the marriage until 2009.

3

Notwithstanding the terms of the Second Agreement, Rutherford continued to make the mortgage payments on the Property from December of 2007 until March of 2010. In March of 2010, Rutherford stopped making the mortgage payments and all other payments to Whalen. The Property is now in foreclosure.

## Procedural History

Whalen filed the instant action against Rutherford and Daniel on June 29, 2012.[2] In her amended complaint, she asserts the following claims under Virginia law: fraudulent inducement by Rutherford (Count I); breach of quasi-contract by Rutherford (Count II); breach of contract by Rutherford (Count III); and tortious interference with contract by Daniel (Count IV).

Rutherford and Daniel previously moved to dismiss the amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On December 13, 2012, the court denied the defendants' motions.

Following the completion of discovery, Rutherford and Daniel moved for summary judgment. The court held a hearing on the motions on June 3, 2013. The motions have been fully briefed and are ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movant. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from

---

[2] Prior to filing the instant action, Whalen filed suit against Rutherford and others in the Circuit Court of Nelson County. That action was non-suited on July 3, 2012.

which a reasonable jury could return a verdict in her favor. Id. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-movant's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)). In assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial. See Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991) (noting that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment").

## Discussion

### I. Rutherford's Motion for Summary Judgment

Rutherford is named in Counts I, II, and III of the amended complaint. In Count I, Whalen claims that Rutherford fraudulently induced her to sign the Second Agreement. In Count II, Whalen asserts a claim for breach of quasi-contract, related to Rutherford's failure to make mortgage payments. In Count III, Whalen asserts a claim for breach of contract, based on Rutherford's failure to make monthly payments for services rendered by Whalen. Rutherford has moved for summary judgment on all three counts, which will be addressed in turn.

#### A. Count I

In Count I, Whalen claims that Rutherford fraudulently induced her to sign the Second Agreement, which shifted responsibility for the mortgage payments to Whalen. Whalen contends that Rutherford intentionally concealed this material change, and that she would not have signed the Second Agreement if the change had been disclosed.

1. **Applicable Law**

Under Virginia law, which the parties agree is controlling, fraud in the inducement of a contract is a ground for an action for damages, George Robberecht Seafood, Inc. v. Maitland Bros. Co., 255 S.E.2d 682, 683 (Va. 1979), and a principal may be held liable for the fraud of his agent. See Spence v. Griffin, 372 S.E.2d 595, 599 (Va. 1988); Nationwide Ins. Co. v. Patterson, 331 S.E.2d 490, 493 (Va. 1985). To prevail on a claim for fraudulent inducement, a plaintiff must prove the following elements by clear and convincing evidence: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994).

Virginia law "also recognizes fraud by omission, sometimes called 'concealment.'" Bank of Montreal v. Signet Bank, 193 F.3d 818, 827 (4th Cir. 1999). The Supreme Court of Virginia has held that "concealment, whether accomplished by word or conduct, may be the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth." Spence, 372 S.E.2d at 599. However, "the failure to disclose information is generally not actionable as fraudulent concealment in the absence of some duty to disclose." Bank of Montreal, 193 F.3d at 829. To proceed on a fraud claim based upon concealment, the Supreme Court of Virginia has "required either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact." Norris v. Mitchell, 495 S.E.2d 809, 812 (Va. 1998); see also Lambert v. Downtown Garage, Inc., 553 S.E.2d 714, 717-18 (Va. 2001).

A two-year statute of limitation applies to claims for damages resulting from fraud. Va. Code Ann. § 8.01-243(A). Such claims accrue when "the fraud . . . is discovered or by the

6

exercise of due diligence reasonably should have been discovered." Va. Code Ann. § 8.01-249(1). "The language 'by the exercise of due diligence reasonably should have been discovered,' as used in . . . § 8.01-249, means [s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances . . . ." STB Marketing Corp. v. Zolfaghari, 393 S.E.2d 394, 397 (1990) (internal citation omitted). "Whether such due diligence has been exercised must be ascertained by an examination of the facts and circumstances unique to each case." Id.

2. **Analysis**

Applying the foregoing principles, the court concludes that genuine issues of material fact preclude the entry of summary judgment on Whalen's claim that Rutherford fraudulently induced her to sign the Second Agreement. As set forth above, Rutherford initiated the drafting of the agreement and recruited his employee, Jody Bakes, to handle the matter for him. Consistent with Whalen's understanding that Rutherford would finance the construction of the new home, the First Agreement, which was presented to Whalen in November of 2007, provided that Rutherford would be responsible for the mortgage and tax payments. Whalen signed the First Agreement subject to the deletion of paragraph eight, which required her to pay for maintenance and insurance, since she did not have the cash flow to satisfy those obligations. Less than a week later, at 4:15 in the afternoon, Jody Bakes advised Whalen that "the changes were made," that Whalen needed to sign "the last page" before the attorney's office closed, and that if Whalen "didn't do it, the note was going to expire and they would have to start over again." (Whalen Dep. at 67) (emphasis added). Whalen arrived at the attorney's office five minutes before the office closed, was presented with the last page of the Second Agreement, and signed that page.

Unbeknownst to Whalen, the Second Agreement required her to make the mortgage, insurance, and tax payments and, thus, imposed even greater financial obligations than the First Agreement.

Viewing the record in the light most favorable to Whalen, the court concludes that a reasonable jury could find that Rutherford had a duty to disclose the material changes contained in the Second Agreement, and that his "nondisclosure was the equivalent of a fraudulent assertion of a material fact, knowingly made with intent to mislead." Spence, 372 S.E.2d at 599. As the United States Court of Appeals for the Fourth Circuit observed in Bank of Montreal, such duty may arise "if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist," or "if one party takes actions which divert the other party from making prudent investigations." Bank of Montreal, 193 F.3d at 829. Here, a reasonably jury could find that the change requiring Whalen to make the mortgage payments was material; that Rutherford knew that Whalen expected him to make the mortgage payments and that she was acting on the assumption that the Second Agreement was identical to the First Agreement in that respect; and that Whalen's mistaken belief that the only change to the Second Agreement was the one that she requested was induced by the representations made by Rutherford's agent. A reasonable jury could likewise find that the decision not to disclose the material changes to the Second Agreement was "knowing" and "deliberate."[3] Norris, 495 S.E.2d at 812.

In moving for summary judgment on this claim, Rutherford makes much of the fact that Whalen did not request to see the entire Second Agreement before signing the last page. While a

---

[3] The court notes that the record contains evidence of other misrepresentations and omissions by Rutherford. As summarized above, Rutherford failed to disclose that he had married Daniel, and, following the marriage, signed loan documents certifying that he intended to make the Property his primary residence. While the court agrees with Rutherford that these additional misrepresentations and omissions are not actionable on their own, the court is of the opinion that such evidence is probative of Rutherford's intent.

party's failure to read a document generally does not relieve the party of her obligations, that rule "does not apply . . . where [the opposing party] induced the [party] not to read it." Spence, 372 S.E.2d at 599 (citing Carter v. Carter, 291 S.E.2d 218, 221 (Va. 1982)). In light of the representations made by Rutherford's agent, the circumstances under which Whalen was arguably pressured to sign the Second Agreement, and the degree of trust that Whalen afforded Rutherford as a result of their decades-long relationship, the court is convinced that a reasonable jury could find that her failure to request and read the entire Second Agreement was excusable. See Id. (holding that the circumstances excused a grantor's failure to read a deed of gift, where "the clerk's office was about the close for the day," the grantor trusted the grantees and their agent, and she was assured by the agent that the deed was "'like [she] wanted it'").

To the extent Rutherford argues that Whalen's fraudulent inducement claim is barred by the statute of limitations, the court concludes that genuine issues of material fact preclude summary judgment on this ground as well. It is undisputed that Whalen did not obtain a copy of the Second Agreement until she filed the previous lawsuit against Rutherford and others in 2011 and, thus, that she did not discover that the material changes had been concealed from her until that time. While Rutherford faults Whalen for not requesting a copy of the Second Agreement after she signed it and argues that she failed to act with due diligence, the "issue[ ] of when a fraud should reasonably have been discovered, as with most issues of reasonableness, are typically best left to the jury." Pennsylvania Life Ins. Co. v. Bumbrey, 665 F. Supp. 1190, 1202 (E.D. Va. 1987). On this record, the court concludes that a jury must determine when Whalen, through the exercise of due diligence, should have discovered the material changes to the Second Agreement.

9

Accordingly, the court will deny Rutherford's motion for summary judgment with respect to this claim.[4]

### B. Count II

In Count II, Whalen seeks to recover for breach of quasi-contract, based on Rutherford's failure to make mortgage payments. In moving for summary judgment on this claim for equitable relief, Rutherford argues that the claim fails as a matter of law, since the subject matter of the claim is covered by an express contract, namely the Second Agreement. This principle is well-established under Virginia law. See, e.g., WRH Mortg., Inc. v. S.A.S. Assocs., 214 F.3d 528, 534 (4th Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi contract or unjust enrichment does not lie."). Because Whalen has provided no authority to suggest that any exception exists to the general rule barring recovery for unjust enrichment when an express contract covers the subject matter at issue, the court will grant Rutherford's motion with respect to this claim.[5]

---

[4] In his initial brief, Rutherford also argued that Whalen's claim of fraudulent inducement is barred by the economic loss rule. For the reasons stated in the court's previous memorandum opinion and order, the court remains convinced that this argument is without merit. See Whalen v. Rutherford, No. 3:12cv00032, 2012 U.S. Dist. LEXIS 176464, at *17-20 (W.D. Va. Feb. 1, 2013); see also S. Coal Sales Corp. v. Xcoal Energy & Res., No. 7:12-cv-00265, 2013 U.S. Dist. LEXIS 13469, at *12-13 (W.D. Va. Feb. 1, 2013) (emphasizing that both the Fourth Circuit and the Supreme Court of Virginia have recognized a "'fraud in the inducement' exception to the economic loss rule").

[5] The court recognizes that Whalen claims that the Second Agreement was induced by fraud. However, under Virginia law, a fraudulently procured contract is not automatically void, but "voidable at the option of the party injured by the fraud." Anderson v. Sharma, 38 Va. Cir. 22, 30 (Va. 1995). If Whalen is unsuccessful in her proof of Count I, it follows that the Second Agreement remains the only written statement establishing the relationship of the parties with respect to the Property, thus foreclosing any claim for breach of quasi-contract. Consequently, the plaintiff either will be successful in prevailing in her action at law or not at all.

### C. Count III

Count III of the amended complaint asserts a claim for breach of contract by Rutherford. Specifically, Whalen claims that she and Rutherford "agreed that Rutherford would be responsible for providing . . . approximately $20,000 per month to W&R Partnership for services rendered to Rutherford by Whalen through W&R Partnership," and that Rutherford breached this agreement, when he stopped making payments to W&R Partnership in March of 2010. (Am. Compl. ¶¶ 85-86.)

In an action for breach of contract under Virginia law, a plaintiff must demonstrate (1) an enforceable contract, (2) a violation or breach of that contract, and (3) consequential injury or damage to the plaintiff. See Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 317 (Va. 1989). To prove the formation of an enforceable contract, the plaintiff must show that there was a meeting of the minds on all material terms. See Hertz Corp. v. Zurich Am. Ins. Co., 496 F. Supp. 2d 668, 676 (E.D. Va. 2007) ("[T]he base-line requirement for finding the existence of a contract, written, oral, implied, or otherwise, is a showing of mutual assent at the time of the agreement, i.e., the proverbial 'meeting of the minds.'") (quoting Snyder-Falkingham v. Stockburger, 457 S.E.2d 36, 39 (Va. 1995)).

Applying these principles, the court concludes that Rutherford is entitled to summary judgment on Whalen's claim for breach of contract. Contrary to the allegations in the complaint, there is no evidence that Whalen and Rutherford ever agreed that Rutherford would pay her a particular salary, much less one in the amount of $20,000 per month. Although the W&R Partnership Agreement provides that Whalen will receive a salary commensurate with her time, effort and expertise, the Partnership Agreement does not require Rutherford to fund the salary or specify any particular dollar amount to be paid. During her deposition, Whalen testified that she

received monthly checks from Rutherford, which were drawn from his personal banking account. (Whalen Dep. at 30.) She acknowledged, however, that "Larry [Rutherford] would determine [the amount of the monthly checks]" and, thus, that the amount was "left . . . at his discretion." (Id. at 29, 95.)

Given the evidence in the record, including Whalen's own deposition testimony, the court concludes that no reasonable jury could find in Whalen's favor on her claim for breach of contract. Accordingly, the court will grant Rutherford's motion with respect to this claim.

## II.    Daniel's Motion for Summary Judgment

In Count IV of the amended complaint, Whalen alleges that Daniel tortiously interfered with the contractual relations between Whalen and Rutherford, after she learned about the couple's longstanding personal and business relationship. To prevail on a claim for tortious interference with a contract or business expectancy in Virginia, a plaintiff must show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Duggin v. Adams, 360 S.E.2d 832, 835 (Va. 1987) (quoting Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985)).

In this case, the parties' dispute centers on the third element, which requires Whalen to prove that Daniel intentionally interfered with a contractual relationship or business expectancy. Following the completion of discovery, Whalen's only evidence in support of this element is her own account of a phone conversation with Doris Alderfer, Rutherford's executive assistant, during which Alderfer allegedly indicated that Daniel "had taken over Rutherford's finances" and "cut Whalen off." (Whalen's Answers to Interrogatories at 10.) The court agrees with Daniel that

such evidence is inadmissible hearsay under Rules 801(c)(1) and 802 of the Federal Rules of Evidence, and that it cannot be considered on summary judgment.

In her brief in opposition to Daniel's motion for summary judgment, Whalen argues that the statement falls within the agency exclusion set forth in Rule 801(d)(2)(D), because Alderfer was an "agent and employee of Rutherford" at the time the statement was made. (Br. in Opp'n to Daniel's Mot. at 6, 7.) This argument, however, misconstrues the rule. Rule 801(d)(2)(D) "provides that a statement is not hearsay if it was made by an agent against whom it is offered, concerns a matter within the scope of the agency, and was made during the existence of the agency." Brown v. City of N. Chicago, 365 F. App'x 13, 15 (7th Cir. 2010). To fit within this exclusion, "[t]he proponent of the vicarious admission must establish a foundation that demonstrates that the declarant at the time of the making of the statement was an employee or an agent of the party against whom the statement is offered." American Eagle Ins. Co. v. Thompson, 85 F.3d 327, 333 (8th Cir. 1996) (internal citation omitted).

Here, the record before the court is devoid of any allegations or evidence suggesting that Alderfer was Daniel's agent at the time she made the relevant statement to Whalen. Instead, the evidence proffered by the defendants, including the deposition testimony of Alderfer, Daniel, and Rutherford, indicates that Alderfer worked solely for Rutherford. Consistent with the defendants' evidence, Whalen emphasizes multiple times in her own brief that Alderfer was Rutherford's agent and employee. See, e.g., Whalen's Br. in Opp'n to Daniel's Mot. at 7 ("It is undisputed that Alderfer is the agent of Rutherford and that making payments on both Rutherford's personal and business accounts was within the scope of her employment.").

Based on the foregoing, the court concludes that Whalen has failed to meet her burden of establishing the necessary agency relationship between Daniel and Alderfer. Consequently,

Whalen's account of the phone conversation with Alderfer is not admissible under Rule 801(d)(2)(D) and may not be considered on summary judgment. See Maryland Highways Contractors Ass'n, 933 F.2d at 1251. In the absence of any other evidence that Daniel intentionally interfered with a contractual relationship or business expectancy, Whalen's claim of tortious interference cannot withstand Daniel's summary judgment motion. Accordingly, Daniel's motion will be granted.

### Conclusion

For the reasons stated, Rutherford's motion for summary judgment will be granted in part and denied in part, and Daniel's motion for summary judgment will be granted.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 21st day of June, 2013.

*/s/ Glen Conrad*
Chief United States District Judge